# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| IN RE DELAWARE PUBLIC SCHOOLS LITIGATION | ) )  | C.A. No. 2018-0029-JTL COUNTY TRACK |

## OPINION ADDRESSING REQUEST FOR EXPENSES

Date Submitted: February 8, 2024
Date Decided: May 30, 2024

Richard H. Morse, COMMUNITY LEGAL AID SOCIETY, INC., Wilmington, Delaware; Dwayne Bensing, ACLU FOUNDATION OF DELAWARE, INC., Wilmington, Delaware; Saul P. Morgenstern, Peta Gordon, ARNOLD & PORTER KAYE SCHOLER LLP, New York, New York; Counsel for Plaintiffs Delawareans for Educational Opportunity and the NAACP Delaware State Conference of Branches.

Wilson B. Davis, NEW CASTLE COUNTY LAW DEPARTMENT, New Castle, Delaware; Counsel for Defendant Michael R. Smith, Chief Financial Officer for New Castle County.

Craig T. Eliassen, Gary E. Junge, SCHMITTINGER & RODRIGUEZ, P.A., Dover, Delaware; Counsel for Defendant Susan Durham, Director of Finance for Kent County.

Krista M. Reale, MARGOLIS EDELSTEIN, Wilmington Delaware; Counsel for Defendant Gina Jennings, Director of Finance for Sussex County.

**LASTER, V.C.**

Court of Chancery Rule 37(c) contains a seldom-used mechanism for shifting expenses.[1] If a party denies a request for admission, and if the requesting party proves at trial that the fact should have been admitted, then the court can order the responding party to pay the expenses that the requesting party incurred proving the improperly disputed fact.

That is what happened here. This decision therefore awards the plaintiffs expenses of $337,224, comprising $322,912 in attorneys' fees and $14,312 in out-of-pocket costs. Each county's prorated share is $112,408.

## I. FACTUAL BACKGROUND

Delaware's public schools receive funding from state, local, and federal sources.[2] School districts generate local funding by levying taxes on non-exempt

---

[1] Picking the right nouns for a fee-shifting ruling is difficult. "Fees" seems only to refer to the amounts charged by the lawyers. "Expenses" seems to mean out-of-pocket payments other than fees. "Costs" might be the same as out-of-pocket expenses, or it might just mean "court costs" under the restricted concept that defines what a party can recover by statute. *See* 10 *Del. C.* § 5106; *Scion Breckenridge Managing Member, LLC v. ASB Allegiance Real Est. Fund*, 68 A.3d 665, 686–88 (Del. 2013).

This decision uses the term "expenses" broadly to refer to all of the expenses associated with proving an issue at trial, including attorneys' fees, plus any amounts paid out of pocket that might more colloquially be called expenses, including amounts paid for experts. That is how Rule 37(c) uses the term. Ct. Ch. R. 37(c) (stating that the requesting party is entitled to "the reasonable expenses incurred in making that proof, including reasonable attorney's fees."). That is also how the Delaware General Corporation Law uses the term. *E.g.*, 8 *Del. C.* § 145(a) (authorizing a corporation in a proceeding other than one brought by or in the right of the corporation to provide indemnification "against expenses (including attorneys' fees), judgments, fines and amounts paid in settlement actually and reasonably incurred . . . .").

[2] The facts are drawn from the court's post-trial decision (the "Opinion"). *In re Del. Pub. Sch. Litig.*, 239 A.3d 451 (Del. Ch. 2020). Capitalized terms not defined herein have the meaning given to them in the Opinion.

property located in their districts. The amount of local funding depends on two variables: the assessed value of the property and the tax rate per dollar of assessed value.

When levying local taxes, the school districts do not prepare their own assessments. By statute, the school districts must use the assessed values established by the governments of Delaware's three counties: New Castle County, Kent County, and Sussex County (collectively, the "Counties").

Before this litigation, the Counties prepared their assessments using decades-old valuations. Sussex County used valuations that became effective in 1974. New Castle County used valuations that became effective in 1983. Kent County used valuations that became effective in 1987. Each county referred to its valuation year as its "base year," and they called their chosen method the "base-year method."

The plaintiffs are non-profit, non-partisan, civic-oriented institutions with a strong interest in Delaware's schools. In January 2018, they filed this litigation because they believed that Delaware's public schools were not an adequate education for students from low-income households, students with disabilities, and students whose first language is not English.

The plaintiffs contended that one of the problems contributing to that failure was a broken system for funding Delaware's public schools. The plaintiffs contended that the Counties' base-year method of assessing properties prevented the portion of funding mechanism that relied on property taxes from operating as intended.

When this case was filed, the Delaware code provided that "[a]ll property subject to assessment shall be assessed at its true value in money" (the "True Value Statute").[3] A property's true value in money is the same as its fair market value. The plaintiffs contended that the Counties' use of decades-old valuations violated the True Value Statute because the base-year method obviously did not assess property at its fair market value.

Under the Delaware Constitution, "[a]ll taxes shall be uniform upon the same class of subjects within the territorial limits of the authority levying the tax" (the "Uniformity Clause").[4] That clause requires that all taxpayers within the same general class be treated the same. The plaintiffs contended that the Counties' use of decades-old valuations violated the Uniformity Clause because different properties had appreciated at different rates over the ensuing decades. As a result, current tax bills bore only a limited resemblance to the property's actual value, resulting in property owners being treated differently.

During discovery, the plaintiffs served requests for admission. One set of requests asked the Counties to admit that because they used decades-old assessments, there was a lack of countywide uniformity in the ratio of market values

---

[3] 9 *Del. C.* § 8306(a) (1953). On August 9, 2023, the Delaware General Assembly amended that section. 84 Del. Laws, c. 162, § 1 (2023). The statute currently states: "All property subject to assessment shall be assessed at its present fair market value." *Id.*

[4] Del. Const. art. VIII, § 1.

to assessed values (the "Uniformity Requests").[5] For example, the Uniformity Request directed to Sussex County asked the county to admit the following:

> Because Sussex County assessments are based on 1974 values, and the degree of change in value of different tax parcels has varied depending on the geographical location within the County, and other market factors, there is a lack of countywide uniformity in the ratio of properties' market values to their assessed values.[6]

The plaintiffs directed comparable requests to Kent County and New Castle County.

A second set of requests asked the Counties to admit that because they used decades old assessments, the Counties were not assessing property at its true value in money (the "True Value Requests").[7] The plaintiffs had obtained annual reports prepared by a committee the Delaware General Assembly created to award a portion of the state funding for the public schools. Those reports calculated sale price ratios by dividing sale prices for properties in each school district with their assessed values (the "Equalization Reports"). The reports showed that properties were selling for multiples of their assessed values.

The True Value Requests asked the Counties to admit that they knew of no facts to contradict the data in the 2019 Equalization Report. For example, the True Value Request directed to Sussex County asked the county to admit the following:

> For each Sussex County School District, Defendants do not know any fact indicating that the ratio of the current true value in money of all taxable real properties in that portion of the school district that is in

---

[5] Dkt. 447, Ex. 3 at Request Nos. 32, 77, & 118.

[6] *Id.* at Request No. 32.

[7] *Id.* at Request Nos. 33, 78, & 119.

4

Sussex County to the total of Assessed Values of those properties listed on the current SC Assessment Roll is different than the number in the column headed "FY 2019 Adj Ratio" and in the row for that school district in Table 1 of the Equalization Report.[8]

The plaintiffs directed comparable requests to Kent County and New Castle County.

In their responses, the Counties objected to and denied the Uniformity Requests and the True Value Requests. The Counties also denied requests for admissions directed to other matters of historical fact.

Because of the Counties responses, the plaintiffs retained Richard Almy as an expert. Almy conducted his own ratio studies to evaluate whether (i) the assessments met acceptable standards of uniformity and (ii) properties were being assessed at their fair market value. The parties stipulated that ratio studies were an accepted method for evaluating those issues.

Before trial, the parties submitted a proposed pre-trial order containing 101 stipulations of fact. Several of the stipulations addressed matters of historical fact that had been the subject of requests for admission that the Counties had denied. Those stipulated facts include:

- "Sussex County performed its last general assessment in 1974."

- "The fair market values of nearly all the taxable properties in Sussex County have changed since 1974."

- "The market values of real properties in different geographical areas and the market values of real properties suitable for different uses within Sussex County have changed at different rates since 1974."

---

[8] *Id.* at Request No. 33.

- "Kent County performed its last general reassessment in 1987."

- "The fair market values of nearly all the tax parcels in Kent County have changed since June 1, 1987, and the degree of change has varied depending on the geographical location within the county."

- "New Castle County performed its last general reassessment in 1983."

- "The fair market values of nearly all the tax parcels in New Castle County have changed since July 1, 1983, and that the degree of change has varied depending on the geographical location within the county."

- "[A New Castle County representative] acknowledged that the 1983 assessed values are not the same as current fair market value."

- "For the Counties, the base year represents the last year in which a county performed a general reassessment of property values—Sussex, New Castle, and Kent County's last general reassessments occurred in 1974, 1983, and 1987 respectively."

- "All County Defendants admit that the fair market values of properties located in different geographical areas within each county have changed at different rates since the Counties' last general reassessments."

- "As a result, each of the County Defendants either admitted that taxes are not taxed in a 'uniform [sic] on the same class of subjects within each' County or that the data was so stale that they had no ability to determine whether the taxes were assessed in a uniform manner in their County."

- "County Defendants further acknowledged that, due to the passage of time since the last general reassessment, the assessed values of property in each of the Counties are not the same as the current fair market value."

- "A general reassessment is necessary for the ratio of fair market values to assessed value (the 'Sales Ratio') to be uniform throughout each county."

The court held trial on July 17 and 18, 2019. During trial, the court heard live testimony from five fact witnesses plus Almy.

On May 8, 2020, the court issued the Opinion. The court found that the Counties' assessments violated the True Value Statute and Uniformity Clause. For purposes of the True Value Statute, the court found that

6

the counties' assessments deviate from present fair market value to an unacceptable degree. Although the base-year methodology remains a theoretically viable approach in the abstract, the indefinite-base-year method that the counties employ has reached the point where it generates arbitrary assessed values divorced from any reasonable approximation of present fair market value.[9]

The court emphasized that "[t]he evidence on this point was one-sided and overwhelming."[10] In making these findings, the court relied on Almy's expert report and testimony, the Counties' stipulations of fact in the pre-trial order, and the sales ratio studies from the Equalization Reports.[11]

For purposes of the Uniformity Clause, the court found:

[T]he counties are using indefinite-base-year methods that do not generate anything approaching acceptable levels of uniformity. The counties have used the same assessed values for so long that taxpayers of the same general class and within the territorial limits of the authority are not treated the same. Instead, taxpayers experience quite different effective rates of taxation. The fact that property owners pay the same nominal rates creates a mirage of uniformity. The underlying assessed values diverge from present fair market value to such a degree that the reality is a profound lack of uniformity.[12]

The court noted that "[a]s with the counties' violations of the True Value Statute, the evidence on this point was one-sided and overwhelming."[13]

---

[9] Op. at 478.

[10] *Id.*

[11] *Id.* at 483–85.

[12] *Id.* at 486.

[13] *Id.*

7

After the court issued the Opinion, the parties began litigating over the appropriate remedy. During that phase of the case, the plaintiffs and the Counties reached settlements.

The plaintiffs moved for an award of expenses. The plaintiffs relied on two sources of authority: (i) the common benefit doctrine and (ii) Court of Chancery Rule 37(c). The court held that the plaintiffs were entitled to recover their expenses under the common befit doctrine (the "Common Benefit Ruling").[14] The court did not reach the Rule 37(c) issue. After an unsuccessful attempt by the counties to obtain interlocutory review of the Common Benefit Ruling,[15] the court issued a decision quantifying the fee award (the "Quantification Ruling").[16] As part of the Quantification Ruling, the court addressed the Counties objections to the expense request, including challenges to the hourly rates that the plaintiffs' lawyers used to calculate the fee award and the amount of time they claimed to have spent on the case. [17]

After the issuance of the Quantification Ruling, the Counties appealed. The Counties challenged both the Common Benefit Ruling and the Quantification Ruling.

---

[14] *In re Del. Pub. Sch. Litig.*, 2022 WL 911961 (Del. Ch. Mar. 28, 2022) (subsequent history omitted).

[15] *In re Del. Pub. Sch. Litig.*, 277 A.3d 296 (Del. 2022).

[16] *In re Del. Pub. Sch. Litig.*, 2023 WL 2711328 (Del. Ch. Mar. 29, 2023) (subsequent history omitted).

[17] *Id.* at *2–6.

8

The Delaware Supreme Court reversed both rulings to the extent they awarded fees under the common benefit doctrine. The justices did not address the court's rulings on hourly rates or time entries. The Delaware Supreme Court remanded the case so that the court could address the Rule 37(c) issue.[18]

## II. LEGAL ANALYSIS

Rule 37(c) states:

> If a party fails to admit the genuineness of any document or the truth of any matter as requested under Rule 36, and if the party requesting the admissions thereafter proves the genuineness of the document or the truth of the matter, the requesting party may apply to the Court for an order requiring the other party to pay the reasonable expenses incurred in making that proof, including reasonable attorney's fees. The Court shall make the order unless it finds that (1) the request was held objectionable pursuant to Rule 35(a), or (2) the admission sought was of no substantial importance, or (3) the party failing to admit had reasonable ground to believe that the party might prevail on the matter, or (4) there was other good reasons for the failure to admit.[19]

---

[18] *In re Del. Pub. Sch. Litig.*, 312 A.3d 703 (Del. 2024).

[19] Ct. Ch. R. 37(c). The rule contains a typographical error: It references Rule 35(a), but that rule addresses: "Physical and mental examination of persons." Ct. Ch. R. 35. The Court of Chancery Rule was modeled on the corresponding federal rule, and examining the federal analog reveals that the cross-reference should cite Rule 36(a), which governs requests for admission. *Compare* Ct. Ch. R. 37(c), *with* Fed. R. Civ. P. 37(c)(2)(A) ("If a party fails to admit what is requested under Rule 36 and if the requesting party later proves a document to be genuine or the matter true, the requesting party may move that the party who failed to admit pay the reasonable expenses, including attorney's fees, incurred in making that proof. The court must so order unless: (A) the request was held objectionable under Rule 36(a) . . . ."); *see also* Ct. Ch. R. 36(a) ("A party who considers that a matter of which an admission has been requested presents a genuine issue for trial may not, on that ground alone, object to the request; the party may, subject to the provisions of Rule 37(c), deny the matter or set forth reasons why the party cannot admit or deny it.").

Unless an exception applies, the award is mandatory.[20] A party who failed to respond to a request with an admission bears the burden of demonstrating that an exception applies.[21] "[E]nforcement is at the discretion of the trial court."[22]

Resolving a request for an award under Rule 37(c) requires that the court undertake three tasks. The court initially must determine whether the party who served the requests for admissions proved the truth of matters that were the subject of the requests that the responding party denied. If so, then the court next must determine whether any basis exists under Rule 37(c)(1)–(4) to deny an award. If none of the exceptions apply, then the court must determine the amount of a reasonable award, limiting the amount to the expenses that the requesting party incurred to prove the facts that the responding party failed to admit.

## A. Whether The Plaintiffs Proved The Truth Of Matters That Were The Subject Of Requests For Admissions

The first issue is whether the plaintiffs proved the truth of matters that were the subject of the requests for admissions that the Counties denied. They did.

In an earlier ruling in the case, the court already addressed this issue, stating: "At trial, the plaintiffs proved the facts that were the subject of the requests for admission. Indeed, the Counties offered no evidence to the contrary."[23]

---

[20] Ct. Ch. R. 37(c) ("The Court shall make the order unless . . . .").

[21] *Cline v. Prowler Indus. of Maryland, Inc.*, 418 A.2d 968, 984 (Del. 1980).

[22] *Corrado v. Simpson*, 599 A.2d 412, 1991 WL 134178, at *6 (Del. 1991) (TABLE).

[23] *In re Del. Pub. Sch. Litig.* 2022 WL 1220075, at *8 (Del. Ch. Apr. 26, 2022).

10

That ruling is law of the case. Under that doctrine, "[o]nce a matter has been addressed in a procedurally appropriate way by a court, it is generally held to be the law of that case and will not be disturbed by that court unless compelling reason to do so appears."[24] "The law of the case doctrine is a self-imposed restriction that prohibits courts from revisiting issues previously decided, with the intent to promote 'efficiency, finality, stability and respect for the judicial system.'"[25] "In more simplified terms, the law of the case doctrine operates as a form of intra-litigation *stare decisis.*"[26] "The 'law of the case' is established when a specific legal principle is applied to an issue presented by facts which remain constant throughout the subsequent course of the same litigation."[27] "The court will revisit decisions under the law-of-the-case doctrine only where the moving party can show that justice compels departure from the doctrine due to clear error, injustice, or a change in circumstances."[28]

The Counties now contend that the plaintiffs "did not prove the facts stated in the [requests]. Instead, they are trying to bootstrap the Court's holding the Counties

---

[24] *Zirn v. VLI Corp.*, 1994 WL 548938, at *2 (Del. Ch. Sept. 23, 1994) (Allen, C.).

[25] *State v. Wright*, 131 A.3d 310, 321 (Del. 2016) (quoting *Cede & Co. v. Technicolor, Inc.*, 884 A.2d 26, 39 (Del. 2005)).

[26] *Frederick-Conaway v. Baird*, 159 A.3d 285, 296 (Del. 2017) (quoting *Carlyle Inv. Mgmt. L.L.C. v. Moonmouth Co. S.A.*, 2015 WL 5278913, at *7 (Del. Ch. Sept. 10, 2015)).

[27] *Hoskins v. State*, 102 A.3d 724, 729 (Del. 2014) (citation omitted).

[28] *AlixPartners, LLP v. Mori*, 2022 WL 1111404, at *11 (Del. Ch. Apr. 14, 2022) (cleaned up).

11

liable on Counts III and IV of the [operative complaint] into findings of fact regarding the [requests] by declaring that the facts asserted in those requests were dispositive."[29] That argument asks the court to overturn its prior ruling, and the Counties offer no compelling justification for doing so.

This decision therefore reiterates that the plaintiffs proved the truth of the matters that were the subject of the Uniformity Requests and True Value Requests. In the interests of completeness, the court explains why.

### 1.    The Uniformity Requests

The Uniformity Requests asked the Counties to admit that their decades-old assessments generated a lack of countywide uniformity. The Counties did not respond to the Uniformity Requests with admissions.

Before trial, the Counties stipulated in the pre-trial order that the degree of change in fair market value relative to the decades-old assessments varied based on "geographical location within the county," and Sussex County stipulated that other market factors also affected the degree of change in value.[30] The court held in the Opinion that "[t]he factual evidence at trial demonstrated, and the Counties did not dispute, that (i) property values have changed dramatically since the Counties conducted their last general assessments, and (ii) property values have not

---

[29] Defs.' Answering Br. at 28.

[30] PTO ¶¶ 39, 58, & 77.

appreciated at uniform rates within each county."[31] The court described the evidence as "one-sided and overwhelming."[32]

The Counties now say that "[t]he Court concluded, generally, that the Counties were violating the Uniformity Clause, but made no finding that there was a wholesale lack of uniformity in each County, as the Plaintiffs sought to have the Counties admit."[33] That is preposterous. The Uniformity Requests asked the Counties to admit that there was a lack of "countywide uniformity," i.e., a wholesale lack of uniformity in each County. At trial, the plaintiffs proved there was a lack of countywide uniformity, i.e., a wholesale lack of uniformity in each County.

The plaintiffs proved the truth of the matters that were the subject of the Uniformity Requests. Given the facts on the ground, it is difficult to understand why the Counties denied those requests in the first place.

### 2. The True Value Requests

The True Value Requests asked the Counties to admit that they did not know any facts indicating that the sales ratios for the properties in each county differed from the sales ratios in the 2019 Equalization Report. The Counties did not respond to the True Value Requests with admissions.

---

[31] Op. at 495.

[32] *Id.* at 486.

[33] Defs.' Answering Br. at 28–29.

After trial, the court held that "[t]he plaintiffs proved by a preponderance of the evidence that the Counties violate the True Value Statute by using an indefinite-base-year method of assessment that produces assessed values that diverge wildly from present fair market value."[34] The court emphasized that "[t]he evidence on this point was one-sided and overwhelming."[35]

In ruling in the plaintiffs' favor, the court expressly relied on the sales ratio data in the 2019 Equalization Report. The court found that the Equalization Committee "conducted sales ratio studies that reveal a wide divergence between assessed values and fair market value. In its recommendations for 2017, 2018, and 2019, the Equalization Committee determined that the divergence was so great that it could not make an equitable recommendation as to the allocation of Equalization Funding."[36]

At trial, the Counties did not introduce any evidence contradicting the sales ratio data in the 2019 Equalization Report. Nor did the Counties proffer any evidence on property values. The record at trial therefore reflected that the Counties knew of no facts indicating that the sales ratios for the properties in each county differed from the sales ratios in the 2019 Equalization Report.

---

[34] Op. at 485.

[35] *Id.* at 478; *see also id.* at 486–87 ("In this case, the plaintiffs introduced persuasive evidence of systemic problems with the Counties' assessments. Even assuming that the evidentiary standard was a higher one, the plaintiffs presented clear and convincing evidence that the Counties fail to comply with the True Value Statute.").

[36] *Id.* at 484 (citing sales ratio data in 2019 Equalization Report).

The Counties respond with a strawman. They contend that "presumably the Plaintiffs were asking the Counties to admit that the sales ratios in the 2019 Equalization Report were correct."[37] Then they argue that the plaintiffs failed to "put on any evidence to establish the accuracy of the sales ratios in the 2019 Equalization Report" or call its drafter to testify regarding his calculations.[38] That is not what the True Value Requests asked the Counties to admit. The True Value Requests sought admissions concerning the Counties' knowledge, not the accuracy of the sales ratio data in the 2019 Equalization Report.

Next, the Counties argue that the plaintiffs "tacitly conceded that proving the facts asserted in the [True Value Requests] were [sic] not enough to win their case by hiring Mr. Almy to conduct the ratio study necessary to prove the Counties were violating" the True Value Statute.[39] That is another strawman. The plaintiffs had no obligation to present only the minimum amount of evidence necessary to prevail. They were entitled to present all of the evidence they had at their disposal. It would have been irresponsible for the plaintiffs to gamble on winning at trial without an expert. A court will not second guess a rational tactical decision made by counsel.[40]

---

[37] Defs.' Answering Br. at 29.

[38] *Id.*

[39] *Id.* at 29–30.

[40] *Cline*, 418 A.2d at 985 ("This Court, for the purposes of a motion under Rule 37(c), will not second-guess the trial tactics adopted by a party, unless the record clearly shows that the action was undertaken solely to enlarge the amount of expenses or otherwise to harass.").

The plaintiffs' decision to retain Almy is therefore not proof that responding to the Uniformity Requests required expert testimony. Nor is the issue under Rule 37(c) whether the fact that the party failed to admit would have won the case for the other side. The issue is whether the responding party denied the request and whether the party serving the request for admission proved the truth of the subject of the request at trial.

In this case, the Counties failed to present *any* evidence at trial contradicting the 2019 Equalization Report. Based on the Counties complete lack of evidence, the court found that the Counties knew of no facts that contradicted the 2019 Equalization Report. The plaintiffs proved the truth of the matters that were the subject of the True Value Requests.

## B. Whether There Are Any Grounds Under Rule 37(c)(1)–(4) To Deny Fees

The plaintiffs satisfied the first requirement for a Rule 37(c) award by establishing that the Counties failed to respond to the Uniformity Requests and the True Value Requests with admissions, and the plaintiffs subsequently proved the facts that were the subject of those requests at trial. The next issue is whether an exception to Rule 37(c) forecloses an award. Absent an exception, the rule provides that the court "shall" award expenses to the requesting party.[41]

---

[41] *See* Ct. Ch. R. 37(c).

The Counties bore the burden of establishing the existence of an exception under Rule 37(c)(1)–(4).[42] They failed to meet that burden.

### 1. Whether The Requests Were Objectionable

Under Rule 37(c)(1) the court may deny the request for fees if "the request was held objectionable pursuant to [Rule 36(a).]" [43] Rule 36(a) authorizes a party to serve requests for admission directed to "the truth of any matters within the scope of Rule 26(b) set forth in the request that relate to statements or opinions of fact or of the application of law to fact, including the genuineness of any documents described in the request."[44] A party may validly object "if a request goes beyond the scope of discovery as broadly defined in Rule 26(b)" or "if a request is so defective in form that an answer to it cannot be required."[45]

The cross-reference to Rule 26(b) means that to determine the propriety of a request for admission, a court looks to Rule 26 and the caselaw interpreting it. Under Rule 26(b), "the scope of permissible discovery is broad, therefore 'objections to discovery requests, in general, will not be allowed unless there have been clear abuses of the process which would result in great and needless expense and time

---

[42] *Cline*, 418 A.2d at 984.

[43] Ct. Ch. R. 37(c)(1).

[44] Ct. Ch. R. 36(a).

[45] 8B Charles Alan Wright, Arthur R. Miller & Richard L. Marcis, *Federal Practice and Procedure* § 2262 (3d. ed.), Westlaw (database updated Apr. 2023) [hereinafter "Wright & Miller"].

17

consumption.'"[46] "The burden is on the objecting party to show why and in what way the information requested is privileged or otherwise improperly requested."[47] For an objecting party to carry its burden, the objection must be "specific, the party making it must explain why it applies on the facts of the case to the request being made, and if the party is providing information subject to the objection, the party must articulate how it is applying the objection to limit the information it is providing."[48] In short, "[o]bjections should be plain enough and specific enough so that the Court can understand in what way the [discovery is] claimed to be objectionable."[49]

"A party that fails to assert a proper, timely objection to a discovery request risks waiver of its objections."[50] Parties must lodge objections in compliance with Rule 36(a), "not subsequent to trial in an effort to resist a motion for expenses under Rule 37(c)."[51] Under Rule 36(a), objections must be served "within 30 days after service of

---

[46] *Prod. Res. Gp., L.L.C. v. NCT Gp., Inc.*, 863 A.2d 772, 802 (Del. Ch. 2004) (footnote omitted) (quoting *Van De Walle v. Unimation, Inc.,* 1984 WL 8270 (Del.Ch. Oct. 15, 1984)).

[47] *Twitter, Inc. v. Musk*, 2022 WL 3591142, at *1 (Del. Ch. Aug. 23, 2022) (cleaned up).

[48] *In re Oxbow Carbon LLC Unitholder Litig.*, 2017 WL 959396, at *3 (Del. Ch. Mar. 13, 2017).

[49] *Van de Walle*, 1984 WL 8270, at *2.

[50] *Bocock v. Innovate Corp.*, 2023 WL 8453525, at *3 (Del. Ch. Dec. 6, 2023); *see also Gower v. Beldock*, 1998 WL 200267, at *2 (Del. Ch. Apr. 21, 1998) (holding that responding party waived objection to request for production by failing to timely assert it); *Fingold v. Comput. Entry Sys. Corp.*, 1990 WL 11633, at *1 (Del. Ch. Jan. 26, 1990) (same).

[51] *Cline*, 418 A.2d at 984; 7 James Wm. Moore et al., *Moore's Federal Practice* § 36.11[5][c] (2024) [hereinafter "Moore's"] (discussing identical federal rule and stating "[a]lthough Rule 36 does not contain a specific waiver provision, as do Rules 33 and 34, courts of

18

the request" or "before the expiration of 45 days after service of the summons and complaint upon the defendant."[52]

The Counties contend that the court should not award expenses to the plaintiffs because the Uniformity Requests and the True Value Requests were objectionable. That is not so.

### a.    The Uniformity Requests

The Counties have not shown that the Uniformity Requests were objectionable. Kent County did not lodge any objections to its Uniformity Request.[53] The time for making objections has long passed, and Kent County cannot raise new objections now, after the court's final decision on the merits. Kent County waived any objections it might have had.

New Castle County and Sussex County lodged identical objections to their Uniformity Requests. They stated:

> In addition to the foregoing General Objections, [Sussex County] objects to this Request as using a vague undefined term "countywide uniformity" asking a compound question, and asking a question based upon unproved assumptions. [Sussex County] further objects as a Request should not be used to prove a purported causation issue in the action, and one that requires expert testimony. Subject to these objections, the Request is denied.[54]

---

have concluded that an objection to a request for admission not first raised in a timely objection are waived, unless the objecting party can show good cause for the failure.").

[52] Ct. Ch. R. 36(a).

[53] Dkt. 447, Ex. 3 at Response to Request No. 77 ("Denied.").

[54] *Id.* at Response to Request No. 32; *see also id* at Response to Request No. 118.

19

At this point, the Counties rely on four objections that they claim to have preserved: first, that the Uniformity Requests relied on disputed propositions or facts; second, that they were compound, third that the Counties lacked the knowledge necessary to answer the requests, and fourth that the Uniformity Requests sought admissions of ultimate facts.[55]

### i. The Disputed Propositions And Facts Objection

The Counties' objection that the Uniformity Requests rely on disputed propositions or facts runs headlong into the language and purpose of Rule 36(a). It states:

> A party who considers that a matter of which an admission has been requested presents a genuine issue for trial may not, on that ground alone, object to the request; the party may, subject to the provisions of Rule 37(c), deny the matter or set forth reasons why the party cannot admit or deny it.[56]

Rule 36(a) thus makes clear that a request that addresses a disputed issue is not objectionable on that basis.

The relevant language of the Chancery rule tracks language added to the analogous federal rule in 1970.[57] Before the 1970 amendment, a line of cases held

---

[55] Defs.' Answering Br. at 31–33, 35–36.

[56] Ct. Ch. R. 36(a).

[57] Fed. R. Civ. P. 36 advisory committee's notes to 1970 amendment (discussing amendment to Rule 36(a) and stating "[c]ourts have also divided on whether an answering party may properly object to request for admission as to matters which that party regards as 'in dispute.' The proper response in such cases is an answer." (citations omitted)).

that parties should not use requests for admission to address disputable facts.[58] A

leading federal treatise explains why that few was wrong.

> On principle, however, this should not have been regarded as a valid
> ground for objection. To hold that a request was objectionable if it went
> to disputed facts was far too confining, since it often could not be
> determined, when a request was served, whether a particular fact was
> in truth disputed. Thus a party might avoid an answer, simply because
> a fact was disputable, though it had no intention of disputing it. This
> was contrary to the purpose of the rule, which was and is to eliminate
> from controversy matters that will not be disputed.[59]

---

[58] *Id.*; *accord* Wright & Miller, *supra*, § 2256 (collecting cases).

[59] Wright & Miller, *supra*, § 2256 (footnote omitted). A commenter who examined the cases that applied the disputed-facts rule found that they rested on authorities that did not support the proposition. Ted Finman, *The Request for Admissions in Federal Civil Procedure*, 71 Yale L.J. 371, 394, 400–02 (1962). The disputed-facts rule rested largely on four decisions: *Fidelity Tr. Co. v. Vill. of Stickney*, 129 F.2d 506 (7th Cir. 1942); *Bowles v. Soverinsky*, 65 F. Supp. 808 (E.D. Mich. 1946); *Waider v. Chicago, R.I. & Pac. R.R.*, 10 F.R.D. 376 (S.D. Iowa 1950), and *Knowlton v. Atchison, T. & S.F. Ry.*, 11 F.R.D. 62 (W.D. Mo. 1951). Finman explained that in three of the cases, the courts found the request for admissions objectionable on other grounds, such as because the request sought a legal conclusion. *See Fidelity*, 129 F.2d at 511 ("In any event, the admission requested was not one of facts but a conclusion of law. In fact, it was one of the questions of law most strenuously litigated . . . ."); *Bowles*, 65 F. Supp at 810 ("suppressing" request for admission, in part, because "[Rule 36] does not apply to a request for admission of this character. It applies only to admittable facts; to facts the truth or falsity of which the party may ascertain without much trouble or expense, and without basing them on opinion."); *Waider,* 10 F.R.D. at 378–89 (sustaining objection to portion of request because the request sought "an opinion and conclusion rather than . . . a statement of fact based upon evidence . . . ."). The fourth case did not involve a disputed-facts objection, and the court overruled the objections actually asserted. *See Knowlton*, 11 F.R.D. at 67.

The cases that applied the disputed-facts rule also relied on a statement in the *Cyclopedia of Federal Procedure* to the effect that "requests should not be made for admission of controversial facts." 6 *Cyclopedia of Federal Procedure* § 2914 (2d ed. 1943). But when that statement was made in 1943, "Rule 36 did not contain a provision permitting objections to requests, and the prevailing view was that the courts lacked authority to hear *any* objection." Finman, *supra*, at 400. The cases applying the disputed-facts rule also relied on a statement in the first and second editions of *Moore's* to the effect that Rule 36 should "be used to obtain the admission of facts as to which there is no real dispute." *Id.* at 401. That statement predated the 1943 amendments. *Id.*

The Advisory Committee's notes to the 1970 amendment explained that Rule 36 sought to serve "two vital purposes, both of which are designed to reduce trial time."[60] One was "to facilitate proof with respect to issues that cannot be eliminated from the case."[61] The other was "to narrow the issues by eliminating those that can be."[62] A party could properly seek requests for admissions about disputed facts because

> [t]he very purpose of the request is to ascertain whether the answering party is prepared to admit or regards the matter as presenting a genuine issue for trial. In his answer [to the request for admission], the party may deny, or he may give as his reason for inability to admit or deny the existence of a genuine issue. The party runs no risk of sanctions if the matter is genuinely in issue, since Rule 37(c) provides a sanction of costs only when there are no good reasons for a failure to admit.[63]

The 1970 amendments therefore provided that a party "must not object solely on the ground that the request presents a genuine issue for trial."[64]

In light of these authorities, the Counties could not properly object to the Uniformity Requests as relying on disputed propositions or facts. Moreover, the Counties never really disputed the subject matter of the Uniformity Reqeusts. In the

---

[60] Fed. R. Civ. P. 36 advisory committee's notes to 1970 amendment.

[61] *Id.*

[62] *Id.*

[63] *Id.*

[64] Fed. R. Civ. P. 36(a)(5); *accord* Wright & Miller, *supra*, § 2262 ("A party cannot object on the ground that the request goes to a disputable matter that presents a genuine issue for trial. . . . An answer, rather than an objection, is now the only proper response if a party considers that it has been asked to admit something that it disputes."); Moore's, *supra*, at § 36.10[7] ("A party must not object solely on the ground that the request presents a genuine issue for trial.").

pre-trial order, the Counties stipulated to the truth of each of the facts that the Uniformity Requests sought to establish. That made the Counties' objection to the Uniformity Requests doubly improper: By rule, it was not a proper objection, and on the facts of the case, it was not true.

## ii.     The Compound Requests Objection

The Counties next object to the Uniformity Requests as compound. That objection also fails.

Rule 36(a) requires that "[e]ach matter of which an admission is requested shall be separately set forth."[65] Interpreting the equivalent federal rule, a leading treatise explains that "[e]ach request for an admission should be phrased simply and directly so that it can be admitted or denied without explanation."[66] That means that "[a] request for an admission, except in a most unusual circumstance, should be such that it could be answered yes, no, the answerer does not know, or a very simple direct explanation given as to why he cannot answer, such as in the case of privilege."[67] Requests for admission are not objectionable when they ask questions that "would not have violated the rules of evidence had they been asked at the trial." [68]

---

[65] Ct. Ch. R. 36(a).

[66] Wright & Miller, *supra*, § 2258.

[67] *Id.* (quoting *Johnstone v. Cronlund*, 25 F.R.D. 42, 46 (E.D. Pa. 1960)).

[68] *Johnstone,* 25 F.R.D. at 46.

23

The Uniformity Requests met that standard. Each could be denied without further explanation, and Kent County did so. Sussex County and New Castle County lodged objections, then responded similarly. The Uniformity Requests qualified as the kind of "yes" or "no" questions that a lawyer could ask at trial during cross examination.

### iii.    The Lack Of Knowledge Objection

The Counties are also unjustified in asserting that that they lacked knowledge sufficient to respond to the Uniformity Requests. An answering party "may not give lack of information or knowledge as a reason for failure to admit or deny unless the party states that the party has made reasonable inquiry and that the information known or readily obtainable by the party is insufficient to enable the party to admit or deny."[69] It goes without saying that any statement about reasonable inquiry and insufficiency must actually be true.

Given the facts on the ground, it should have been easy for the Counties to admit that their base-year methodology generated non-uniform valuations. Common sense pointed in that direction. With a little effort, the Counties could have confirmed that intuition. Kent County was able to respond and did.

The Counties now point to the plaintiffs' decision to hire Almy and claim that shows that only an expert could establish the necessary lack of uniformity. The

---

[69] Ct. Ch. R. 36(a); *see also* Wright & Miller, *supra*, § 2262 (a party "cannot object that it lacks personal knowledge of the matter so long as the information is obtainable on reasonable inquiry.").

plaintiffs could have relied solely on circumstantial evidence and intuition, but they decided to hire an expert to ensure that they could carry their burden. The Counties were in a different position. They possessed decades of assessment data, first-hand knowledge about the properties within their borders, and the same ability to use common sense about whether every property in each county had appreciated in value uniformly over multiple decades. The Counties could have admitted the Uniformity Requests and saved everyone a lot of trouble.

Even assuming for the sake of argument that the Counties lacked knowledge initially, they had an obligation to update their responses once they received the Almy Report. Under Rule 26(e)(2),

> A party is under a duty seasonably to amend a prior response if the party obtains information upon the basis of which (A) the party knows that the response was incorrect when made, or (B) the party knows that the response though correct when made is no longer true and the circumstances are such that a failure to amend the response is in substance a knowing concealment.[70]

The Counties decided not to hire an expert of their own and had no basis to dispute Almy's report. Instead, they agreed to stipulated facts about non-uniformity in the pre-trial order. Long before then, the Counties had an obligation to update their responses and change their denials to admissions.[71]

### iv.    The Ultimate Facts Objection

---

[70] Ct. Ch. R. 26(e)(2).

[71] *See* PTO ¶¶ 78–81; *see also id.* ¶ 82 ("A general reassessment is necessary for the ratio of fair market values to assessed value (the 'Sales Ratio') to be uniform throughout each county.").

25

Finally, the Counties argue that the Uniformity Requests were objectionable because they sought admissions about "ultimate facts in issue."[72] That objection does not appear anywhere in the Counties' responses and is waived. The closest language asserted that the Uniformity Requests "should not be used to prove a purported causation issue in the action," but that identifies an issue of causation, not fact.

In support of their waived objection, the Counties assert that the plaintiffs should not have used requests for admission to establish the "ultimate facts in issue."[73] Court of Chancery Rules 36 and 37(c) are modeled on Federal Rules of Civil Procedure 36 and 37(c)(2)), making federal authorities persuasive for purposes of their interpretation.[74] Virtually unanimous federal authority holds that requests for admissions can address so-called ultimate facts.[75] Federal treatises on civil procedure

---

[72] Defs.' Answering Br. at 30–31.

[73] Defs.' Answering Br. at 30 n.114, 31 n.119.

[74] *Emerald P'rs v. Berlin*, 726 A.2d 1215, 1226 (Del. 1999) ("Since the Court of Chancery Rules parallel the federal rules, federal precedents are persuasive." (citing *Mann v. Oppenheimer & Co.,* 517 A.2d 1056, 1061 (Del. 1986)); *Icahn P'rs LP v. deSouza*, 2024 WL 180952, at *11 n.45 (Del. Ch. Jan. 16, 2024) ("Where, as here, a Federal Rule of Civil Procedure closely tracks a Delaware court's rules, cases applying the federal rule are persuasive in applying the Delaware court's rules." (citing *Crumplar v. Sup. Ct.*, 56 A.3d 1000, 1007 (Del. 2012)).

[75] *E.g.*, *Carney v. I.R.S.*, 258 F.3d 415, 419 (5th Cir. 2001) ("Rule 36 allows litigants to request admissions as to a broad range of matters, including ultimate facts, as well as applications of law to fact." (collecting authorities)); *Campbell v. Spectrum Automation Co.*, 601 F.2d 246, 253 (6th Cir. 1979) (affirming trial court's ruling that request were not objectionable and award of fees under Federal Rule 37(c) and stating "[t]hat a request seeks admissions on 'ultimate facts,' or is dispositive of the entire case, is irrelevant."); *Hull v. Spot Invests., LP*, 2023 WL 2958619, at *3 (C.D. Cal. Mar. 23, 2023), *aff'd*, 2024 WL 511879 (9th Cir. Feb. 9, 2024) ("Requests that seek admissions on 'ultimate facts' or are dispositive of an entire case fall within the scope of Rule 36(a) and are therefore not objectionable." (citing *Campbell*, 601 F.2d at 253)); *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 281 F.R.D. 1,

26

acknowledge that settled proposition.[76] So unanimous are the federal courts on this

issue that the Counties only cited one federal case in their brief, and they cited it for

10 (D.D.C. 2011) ("Rule 36 allows litigants to request admissions as to a broad range of facts, including ultimate facts, as well as applications of law to fact.") (quoting *Carney*, 258 F.3d at 419); *In re Enron Corp. Sec., Deriv. & Erisa Litig.*, 762 F. Supp. 2d 942, 959 (S.D. Tex. 2010) (same); *Guinan v. A.I. duPont Hosp. for Children*, 2008 WL 938874, at *2 (E.D. Pa. Apr. 7, 2008) ("It is irrelevant that a particular Request seeks admission of 'ultimate facts.' Rule 36 does not except such facts from its requirements. An objection based solely upon 'genuine issue for trial' is not proper."); *Cereghino v. Boeing Co.*, 873 F. Supp. 398, 403 (D. Or. 1994) ("As a preliminary matter, a request for admission under Rule 36, and a resultant admission, are not improper merely because they, as here, relate to an 'ultimate fact,' or prove dispositive of the entire case." (citing *City of Rome v. United States,* 450 F.Supp. 378, 383 (D.D.C.1978), *aff'd,* 446 U.S. 156, (1980)); *In re Niswonger*, 116 B.R. 562, 566 (Bankr. S.D. Ohio Mar. 29, 1990) ("The scope of Rule 36(a) is quite broad and permissible requests include even 'ultimate facts' or facts dispositive of a case." (citing *Campbell*, 601 F.2d at 253); *Branch Banking & Tr. Co. v. Deutz-Allis Corp.*, 120 F.R.D. 655, 658 (E.D.N.C. 1988) ("I do, however, read the request as asking for defendants' admission with respect to an 'ultimate fact' on a sub-issue in the case. Notwithstanding that finding, under Rule 36(a), a request for admission can relate to 'statements or opinions of fact or of the application of law to fact.' Clearly, a request for admission is not improper merely because it relates to an 'ultimate fact' or to an issue of fact that is dispositive of one aspect of the case." (citing *Rome*, 450 F.Supp at 383)); *In re Sweeten*, 56 B.R. 675, 678 (Bankr. E.D. Pa. 1986) ("Nor does it matter if the plaintiff seeks admissions on so-called 'ultimate facts.' Rule 36(a) neither expressly nor implicitly excepts such facts from its requirements."); *see also Langer v. Monarch Life Ins. Co.*, 966 F.2d 786, 803 (3d Cir. 1992) ("If at that point a party is served with a request for admission of a fact that it now knows to be true, it must admit that fact, even if that admission will gut its case and subject it to summary judgment. That is what Rule 36 was intended to do—narrow the issues for trial, or even altogether obviate the need for trial."); *accord Booth Oil Site Admin. Gp. v. Safety-Kleen Corp.*, 194 F.R.D. 76, 80 (W.D.N.Y. 2000); *cf. Anderson v. United Air Lines, Inc.*, 49 F.R.D. 144, 148 (S.D.N.Y. 1969) (rejecting objection on the grounds that request sought the admission of an ultimate fact before 1970 amendment to Federal Rule 36 and stating "[a]llegations that there is a future agreement to stipulate and that a request seeks the admission of an ultimate fact, when unsupported by affirmative proof, are not grounds for sustaining objections to a request to admit. Additionally, such request calls for an admission of fact which will assist the trial court in narrowing the proof.").

[76] *E.g.*, Moore's, *supra*, at §36.10[7] ("[R]equests for admission and the resulting admissions may relate to the ultimate facts of a case. The admission may serve as proof that is dispositive of an entire case." (footnote omitted)); Wright & Miller, *supra*, § 2256 n.8 ("That a request seeks admissions on 'ultimate facts,' or is dispositive of the entire case, is irrelevant. The rule expressly states that a party may not refuse to respond to a request on the sole ground that the 'matter of which the admission has been requested presents a genuine issue for trial.' Thus, the fact that an admission of prior sales of the patented device by Campbell would have effectively ended the litigation did not make objectionable the request for such

a statement from the *dissenting opinion.*[77] The majority opinion states plainly: "Rule 36 allows litigants to request admissions as to a broad range of matters, including ultimate facts, as well as applications of law to fact."[78] The great weight of state authorities addressing rules modeled on the federal analog also permits requests for admission to address ultimate facts.[79]

---

admission." (quoting *Campbell*, 601 F.2d at 253)); 7 *Cyclopedia of Federal Procedure*, § 25:459 (3d ed.), Westlaw (database updated Jan. 2024) ("[R]equests for admission are properly directed to a party's position on a fact or the application of law to fact, or the party's opinion about a fact or the application of law to fact, and can address ultimate facts that may present a genuine issue for trial."); 10A Alexa Ashworth, Paul M. Coltoff et al., *Federal Procedure, Lawyers Edition* § 26:66 (2024), Westlaw (database updated Mar. 2024) ("A party must not object to a request for admission solely on the ground that the request presents a genuine issue for trial. Thus, requests for admission may relate to ultimate facts or central facts in dispute even though the issue of fact is dispositive of one aspect of the case."(footnotes omitted)); Steven S. Gensler, 1 Federal Rules of Civil Procedure, Rules and Commentary Rule 36, Westlaw (database updated Feb. 2024) ("Rule 36 explicitly permits requests that seek the application of law to fact. This includes so-called 'ultimate facts.'" (footnote omitted)); 4 Barbara M.G. Lynn, *Business and Commercial Litigation in Federal Courts* § 35.6 (5th ed.), Westlaw (database updated Nov. 2022) ("Some older authority holds that requests for admissions as to central facts in dispute are beyond the proper scope of Rule 36, . . . . These cases are of questionable authority today in light of amendments to Rule 36 in 1970, which made clear that a party could not object to a request because it dealt with a matter 'in dispute.' The prevailing view today is that if key facts can properly be established by a set of admissions rather than by an expensive trial, they should be established by admission." (footnotes omitted));*id.* § 35.7 ("[R]equests can properly be used to directly target the ultimate issues in a case.").

[77] Defs.' Answering Br. at 30 & n.16 (citing *Carney*, 258 F.3d at 422 (Duplantier, J., dissenting)). Unlike the preceding citation, the Counties did not flag the citation to the dissent. Presumably it was an innocent mistake. But even the dissent recognized that "[c]learly, Rule 36 can be used to request admissions of *fact* which effectively dispose of all of the issues in a case, with the result that the propounding party would be entitled to summary judgment in the absence of a denial." *Carney*, 258 F.3d at 422 (Duplantier, J., dissenting). In other words, even the dissenter acknowledged that a request for admission could address an ultimate fact.

[78] *Carney*, 258 F.3d at 419.

[79] *See* Russel G. Donaldson, Annotation, *Permissible Scope, Respecting Nature of Inquiry, of Demand for Admission Under Modern State Civil Rules of Procedure,* 42 A.L.R. 4th 489 § 2 (1985), Westlaw (database updated weekly) ("[P]artly as the result of conflicting

An "ultimate fact" is simply "1. A fact essential to the claim or the defense. — Also termed *elemental fact*; *principal fact*" or " 2. A fact that is found by making an inference or deduction from findings of other facts; specif[ally], a factual conclusion derived from intermediate facts."[80] Under the plain language of Rule 36(a), a request for admission can address "the truth of any matters within the scope of Rule 26(b)."[81]

---

interpretative views as to the permissible scope of requests so governed, including conflicts as to whether 'disputed' or 'ultimate' facts, or matters arguably involving opinions of law, should be allowed to form the subject matter of such requests, the federal rule was amended in 1970 to broaden the permissible subject matter of such a request. Many states with rules patterned after the federal model likewise liberalized the scope of their applicable rules. As presently constituted, Rule 36 of the Federal Rules of Civil Procedure permits requests for admission of 'any matters' within the scope of general discoverability, relating to 'statements or opinions of fact, or of the application of law to fact.' As thus amended, the federal rule has been declared to permit requests for admission not only to address claims of the parties seeking discovery, or matters as to which the party making the request bears the burden of proof, but also as to requests for admissions on so-called 'ultimate facts.' The courts of the states which have specifically adopted the amended federal form for their rules governing admission demands or requests, or which have applicable rules employing essentially the same language as the amended federal rule, have generally agreed that the liberalized language is to be taken at face value, and that thus requests for admission not only of 'ultimate facts,' but also for opinions as to facts, admissions of mixed questions of law and fact, or of the application of law to fact, should all be upheld and enforced as involving inquiry of a proper nature . . . ."); 88 C.J.S. *Discovery* § 185, Westlaw (database updated Mar. 2024) ("[P]ursuant to some statutes and rules, a party to a civil action may propound a written request that another party admit the genuineness of specified documents, or the truth of specified matters of fact, an opinion relating to the facts, or the application of the law to the facts. Further, there is authority that requests for admissions may, in addition to seeking evidentiary matters, ask for admissions as to legal issues, contentions, and conclusions, if related to the facts of the case, and thus, a request to admit fault, negligence, or liability is permissible. *Under such authority, a party may seek admissions which are dispositive of the case or which relate to the ultimate facts.*" (footnotes omitted) (emphasis added)).

[80] Fact, *Black's Law Dictionary* (11th ed. 2019); *accord Brehm v. Eisner*, 746 A.2d 244, 254 (Del. 2000) (explaining that to plead demand futility under Rule 23.1 "[w]hat the pleader must set forth are particularized factual statements that are essential to the claim. Such facts are sometimes referred to as 'ultimate facts,' 'principal facts' or 'elemental facts.'").

[81] Ct. Ch. R. 36(a).

Rule 26(b) provides that "[p]arties may obtain discovery regarding any non-privileged matter that is relevant to any party's claim or defense and proportional to the needs of the case . . . ."[82] "Ultimate facts" are relevant by definition under Rule 26(b). Indeed, they are arguably the *most* relevant facts.

The Counties argue that Delaware follows a different rule, relying on *Bryant v. Bayhealth Medical Center, Inc.*[83] But the facts of *Bryant* were unique, and the party in that case served requests for admission that were inappropriate under any standard.

*Bryant* dealt with a statute of limitations defense. The plaintiff filed a paper copy of his complaint and praecipe on May 1, 2006, the last day of the limitations period. The prothonotary accepted the filing, docketed the complaint, and gave it a civil action number. The next day, the Prothonotary sent a notice to the plaintiff stating that the hard copy filing would be rejected and instructing the plaintiff to e-file the pleading. The plaintiff re-filed the documents the same day, then filed another hard copy version of the praecipe on June 21. The action went forward from there.

The defendant served requests for admission asking the plaintiff to admit that the "'attached praecipe' (i) had been filed with the Prothonotary on June 21, 2006, and (ii) was the first 'legally cognizable' document filed with the Superior Court

---

[82] Ct. Ch. R. 26(b).

[83] 937 A.2d 118 (Del. 2007).

requesting service of process upon [the defendant]."[84] The requests did not actually attach the "attached praecipe."

The plaintiff failed to timely respond, so the requests were deemed admitted. Relying on the deemed admissions, the defendant moved for summary judgment in their favor on the theory that the complaint was untimely. The plaintiff did not seek relief from his admissions under Rule 36(b). Instead, the plaintiff filed untimely responses claiming he could not admit or deny the requests because no praecipe had been attached.

The Superior Court granted the motion for summary judgment, holding that the admission was binding and the lawsuit was therefore untimely.[85] The Superior Court agreed with the plaintiff that the complaint was timely filed. The judge reasoned that although the plaintiff did not succeed in filing his papers under May 2, 2006, he had tried to file on May 1, only to have his filing rejected or administrative reasons.[86] But the Superior Court then observed for an action to be timely filed in that court, a party must also file a praecipe with the complaint that seeks to effectuate service of process. The Superior Court treated as binding the plaintiff's admission

---

[84] *Id.* at 120.

[85] *Bryant v. Bayhealth Med. Ctr., Inc.*, 2006 WL 3844061, at *2–3 (Del. Super. Dec. 8, 2006), *rev'd*, 937 A.2d 118 (Del. 2007).

[86] *Id.* at *2.

(established through a failure to timely respond) that no praecipe had been filed until June 21.[87]

On appeal, the Delaware Supreme Court reversed, stating that the trial court's ruling "was erroneous legally, because the admission by default, resulting solely from [the plaintiff's] untimely response to the Request for Admissions, was an improper vehicle to resolve the legal issue of when the action was commenced."[88] Continuing, the justices emphasized that "[t]he purpose of a request for admissions is not to deprive a party of a decision on the merits," then stated that "[r]equests for admissions should not be used to establish the ultimate facts in issue or to demand that the other party admit the truth of a legal conclusion."[89] Building on the concept of a legal conclusion, the Delaware Supreme Court admonished the defendants had submitted or a request for admission seeking "a conclusion of law and an ultimate fact going to the merits of the case."[90] The high court remanded for further proceedings.

The outcome in *Bryant* makes perfect sense as a just adjudication on the facts presented. The record showed that the plaintiff attempted to file both the complaint and a praecipe within the limitations period, only to have the filing rejected for

---

[87] *Id.*

[88] *Bryant*, 937 A.2d at 125.

[89] *Id.* (cleaned up).

[90] *Id.* at 126.

administrative reasons. The defendant then used a request for admission directed to a later praecipe to create a timeliness defense, without ever attaching the relevant praecipe. Finally, the plaintiff did not formally admit the disputed fact. Instead, the plaintiff failed to serve a timely response and hence was deemed to admit that the later praecipe was the first "'legally cognizable' document." The interests of justice cried out for a different result.

In reaching that case-specific result, the Delaware Supreme Court held that the initial paper filing, followed by the e-filing the next day, sufficiently tolled the statute of limitations.[91] The high court then offered an additional basis for reversal: The June 21 praecipe may have been the first "legally cognizable" praecipe, but that did not matter because the June 21 praecipe related back to the attempt to file the complaint and praecipe on May 1.[92]

It was only when providing a third basis for reversal that the Delaware Supreme Court held that the trial court "erred legally by giving effect to the judicial admission."[93] The justices stressed that "*[i]n this specific case*, a request for admission was not the proper vehicle to resolve a legal dispute over when this action was effectively commenced."[94] Only then did the opinion remark that "[r]equests for

---

[91] *Id.* at 122–23.

[92] *Id.* at 125.

[93] *Id.* at 126.

[94] *Id.* (emphasis added).

admission 'should not be used to establish the ultimate facts in issue' or to demand that the other party admit the truth of a legal conclusion."[95] That language is arguably dictum, because the first two bases for reversal rendered the third unnecessary to the holding.

To support the "ultimate facts" proposition, the high court cited the *Thornton* case, an unreported Delaware Superior Court decision from 2006 that granted a responding party an extension of time to answer requests for admissions.[96] That decision recited that "[r]equests for admission should not be used to establish the ultimate facts at issue," but that proposition was not pertinent to the motion. The principal authority on which the *Thornton* case involved a request for relief from a deemed admission established when the party did not timely respond, which the court granted.[97] That decision also recited that "[r]equests for admission should not be used to establish the ultimate facts in issue," but that proposition was not pertinent in that case either.[98] As support for the no-ultimate facts proposition, the court relied on

---

[95] *Id.* (quoting *Thornton v. Meridian Consulting Eng'rs, Del. LLC*, 2006 WL 2126291, at *1 (Del. Super. Feb. 13, 2006)).

[96] *Thornton*, 2006 WL 2126291, at *1.

[97] *Brittingham v. Lankford*, 1987 WL 17179, at *1 (Del. Super. Sept. 8, 1987).

[98] *Id.*

34

*Home Indemnity Company v. Grossi,* a Superior Court opinion from 1983.[99] But that opinion relied on cases applying the pre-1970 version of Federal Rule 36(a).[100]

Through these authorities, a since-discredited federal line of authority that the 1970 amendments sought to eliminate has lived on in Delaware and persisted into the twenty-first century, That is weak tea indeed. Delaware should not be an outlier in its approach to requests for admissions.

If the *Bryant* decision squarely adopted the no-ultimate-facts rule, then of course that holding would be binding. But the language of the *Bryant* decision was technically dictum, because the two prior bases for reversal were sufficient. The language of the case also suggests a case-specific outcome.[101] To that end, the *Bryant* decision twice used language emphasizing the case-specific nature of the ruling, first holding that *"[i]n this specific case,* a request for admissions was not the proper

---

[99] *Id.* (citing *Home Indemnity Co. v. Grossi*, C.A. No. 79C-AU-37, 1983 Del. Super. LEXIS 709 (Del. Super., Mar. 24, 1983)).

[100] *Grossi*, 1983 Del. Super. LEXIS 709, at *6 (first citing *Pickens v. Equitable Life Assurance*, 413 F.2d 1390 (5th Cir. 1969); and then citing *Essex Bank v. Cap. Res. Corp.,* , 432 A.2d 936 (N.J. Super. App. Div. 1981)). The United States Court of Appeals for the Fifth Circuit decided *Pickens* in 1969—before the 1970 amendment. The New Jersey court similarly applied state rules based on the pre-1970 version of Federal Rule 36. *Essex Bank*, 432 A.2d at 531. Neither case applied the post-1970 version. See *Id.* at 539 (relying on pre-1970 amendment cases, including *Pickens*).

[101] *Bryant*, 937 A.2d at 120.

vehicle to resolve a legal dispute over when this action was effectively commenced,"[102] then later criticizing the requests for admission being "deployed *in this manner*."[103]

The Delaware Supreme Court also admonished the defendants for serving a request for admission that effectively sought a legal conclusion.[104] Elaborating in a footnote, the *Bryant* decision stated:

> Federal courts allow litigants to request admissions as to a broad range of matters, including ultimate facts, but "[r]equests for admission cannot be used to compel an admission of a conclusion of law." Fed. R. Civ. P. 36(a) is identical to Super. Ct. Civ. R. 36(a).[105]

The footnote seems to acknowledge that requests for admission addressing ultimate facts are generally permissible, but not where the deemed admission also sought to establish a legal conclusion.

Limiting *Bryant* to deemed admissions that contradict the docket and smack of gamesmanship avoids a direct conflict between that decision and overwhelming federal authority interpreting an analogous rule. To be sure, the Delaware courts are not bound to follow federal law, and when there are sound policy reasons for a different conclusion, the Delaware courts have gone their own way.[106] Here, however,

---

[102] *Id.* at 126 (emphasis added).

[103] *Id.* (emphasis added).

[104] *Id.*

[105] *Id.* at 126 n.33 (citations omitted) (alteration in original).

[106] *E.g.*, *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldgs. LLC*, 27 A.3d 531, 536–37 (Del. 2011) (reaffirming Delaware's reasonable-conceivability pleading standard and rejecting federal plausibility pleading standard).

Chancery Rule 36 seeks to achieve the same purposes as the federal rule: "to expedite the pretrial process and promote the overall efficient administration of justice."[107] Acknowledging that requests for admission can address ultimate facts serves that goal by helping frame the issues in dispute, narrow the issues for trial, and potentially obviate the need for trial altogether.

A party does not face prejudice from being required to respond to a request seeking admissions regarding issues of ultimate fact. A party that denies a request need only reasonably believe that the party could prevail on the issue to avoid paying expenses under Rule 37(c). Given that standard, a rule prohibiting requests for admission addressing ultimate facts serves only to protect parties who would deny a requests despite *not* reasonably believing they could prevail. That is, a party who wants to "avoid an answer, simply because a fact was disputable, though it had no intention of disputing it."[108] There is no good reason to reward that behavior, particularly given the demands on the judicial system.

At least part of the concern that animated the *Bryant* decision appears to be the deemed admission following a non-response.

> It is, of course, incumbent on parties to respond to all discovery requests in a timely manner, and Rule 36 requests are no exception. But requests of this type have the feel of a trap set in the hope of ensnaring the other side in a procedural default. In these circumstances, courts may feel especially inclined to permit the party to withdraw the admissions,

[107] *Corrado,* 1991 WL 134178, at *6.

[108] Wright & Miller, *supra*, § 2256.

though each situation will need to be examined in light of the factors set forth in Rule 36(b).[109]

In *Bryant*, the Delaware Supreme Court cited the availability of a motion to withdraw the deemed admission under Rule 36(b), but the plaintiff had never invoked that escape hatch. The existence of that option gives parties an easy way to escape a trap like the one the defendants set in *Bryant*.[110]

The plain meaning of Rule 36, the great weight of authority interpreting the analogous federal rule, and public policy considerations all favor limiting *Bryant* to the specific situation it addressed: an extreme case in which a party sought to use a deemed admission to construct a timeliness defense contrary to the objective record of docket filings. For the current case, the ultimate-fact objection was waived. To the

---

[109] Gensler, *supra,* Rule 36.

[110] The other Delaware decisions that the Counties cite also involved extreme facts. Two involved deemed admissions and motions for summary judgment under circumstances like those in *Bryant. See R.C. Fabricators, Inc. v. W. Dover Prof'l Park, LLC*, 2009 WL 5177150, at *2 (Del. Super. Sept. 30, 2009) ("The case before this Court today is similar to that in *Bryant*. R.C. bases its request for summary judgment solely on Defendants' failure to respond to its written requests for admission within the requisite thirty-day period. As previously noted, however, requests for admission should not be used to determine the ultimate facts in issue."); *Calbert v. Volkswagen of Am., Inc.*, 1989 WL 147394, at *2 (Del. Super. Nov. 16, 1989) (holding where the plaintiff moved for summary judgment solely on the basis of deemed admissions that "[a]lthough this Court does not sanction the defendant Volkswagen's untimely response to the plaintiff's request for admissions, the plaintiff has not demonstrated that the untimely response and the subsequent answers have prejudiced his claims."). Two involved excessive and burdensome discovery requests. *See Spence v. Layaou Landscaping, Inc.*, 2013 WL 3976669, at *3–4 (Del. Super. Jul. 30, 2013); *Ridgaway v. Bender*, 2004 WL 2050283, at *2, *4 (Del. Super. Sept. 14, 2004). One involved a Rule 37(c) motion for expenses where the court described the request for admission ambiguously as "properly denied." *See Hitchens v. Cannon & Cannon, Inc.*, 1987 WL 764041, at *1 (Del. Super. Dec. 22, 1987).

extent it could be asserted, it would not render the Uniformity Requests objectionable.

### b. The True Value Requests

The Counties also claim that the True Value Requests were objectionable. All of the Counties' responses were substantively identical. None lodged specific objections to the True Value Requests. Instead, they incorporated by reference their objections to a request for an admission about the fair market value of the taxable properties on the 2018 assessment roll.[111] In a representative response, Sussex County stated:

> In addition to the foregoing General Objections, [Sussex County] objects to this Request as asking her to know the value of every taxable parcel in the County effective September 30, 2017. As such, it is overly broad and unduly burdensome. [Sussex County] further objects as a Request should not be used to attempt to prove a central issue in the action; and a Request that seeks similar information that would derive from a claim for relief the Plaintiffs seek in this action, and that Plaintiffs themselves concede would take multiple years to calculate. Subject to these objections, the Request is denied.[112]

The objection to a request for an admission about "a central issue in the case" is substantively the same as an objection for a request about an ultimate fact and fails

---

[111] Dkt. 447, Ex. 3 at Response to Request No. 33 ("In addition to the forgoing General Objections, [Sussex County] reincorporates all the specific objections regarding Request No. 22 above. Subject to theses objections, the Request is denied."); Response to Request No. 78 ("In addition to the foregoing General Objections, [Kent County] reincorporates all the specific objections regarding Request No. 67 above. Subject to these objections, the Request is denied."); Response to Request No. 119 ("In addition to the foregoing General Objections, [New Castle County] reincorporates all the specific objections regarding Request No. 108 above. Subject to these objections, the Request is denied.").

[112] Dkt. 447, Ex. 3 at Response to Request No. 22.

for the reasons previously discussed. It is also not an objection that fairly describes the True Value Requests. Those requests sought to establish whether the Counties had knowledge of any facts indicating that the actual sales ratios differed from those in the 2019 Equalization Report. That was a request about what the Counties knew or did not know. The "central issue" objection was thus both improper and wrong.

The Counties now contend that the True Value Requests were objectionable because they improperly "sought to have the Counties admit the accuracy of third-party documents."[113] None of the Counties raised that objection in response to the requests, so it was waived. It also misconstrues the True Value Requests, which did not seek an admission regarding the accuracy of the 2019 Equalization Report. The True Value Requests sought admissions about the Counties' knowledge.

Finally, the Counties argue that the True Value Requests are objectionable because they are not "simple and concise."[114] That objection was also not made in response to the requests, so it was waived. The objection also depends on the strawman argument that the True Value Requests sought admissions about the accuracy of the 2019 Equalization Report, rather than the Counties' knowledge. The True Value Requests were simple and concise. The Counties simply refused to admit that they had no information that would conflict with the 2019 Equalization Report. The True Value Requests were not objectionable.

---

[113] Defs.' Answering Br. at 34.

[114] *Id.* at 36.

40

## 2. Whether The Admissions Sought Were Of No Substantial Importance.

Under Rule 37(c)(2), a court may decline to award expenses for an improperly denied admission if "the admission sought was of no substantial importance."[115] The Counties did not rely on this exception.[116] Nor could they, given their strenuous arguments that the requests went to the "ultimate facts in issue."

## 3. Whether The Counties Had Reasonable Grounds To Believe They Might Prevail

Under Rule 37(c)(3), the court may decline to award expenses if "the party failing to admit had reasonable ground to believe that the party might prevail on the matter."[117] The Counties did not argue that they had reasonable grounds to believe they might prevail on the matters that were the subject of either the Uniformity Requests or the True Value Requests.[118] That is not surprising, because they did not introduce any evidence at trial on either issue. It is fair to conclude that the Counties did not have reasonable grounds to believe that they might prevail.[119]

---

[115] Ct. Ch. R. 37(c)(2).

[116] *See Emerald P'rs,* 726 A.2d at 1224 ("Issues not briefed are deemed waived.").

[117] Ct. Ch. R. 37(c)(3).

[118] *See Emerald P'rs,* 726 A.2d at 1224.

[119] *See Baks v. Centra, Inc.*, 1998 WL 35249257, at *6 (Del. Super. Aug. 31, 1998) (holding based on defendant's "performance at trial" that "Defendant did not have reasonable ground to believe that it might prevail on the essential elements of the case" where defendant presented "almost no evidence" to dispute the plaintiffs' position, and only called one of the twelve witnesses identified on its witness list).

41

### 4. Whether There Is Any Other Good Reason For the Counties' Failure To Admit

Rule 37(c)(4) ends with a catchall exception that permits the court to decline to award expenses when "there was other good reasons for the failure to admit."[120] The Counties did not invoke this exception.[121]

## C. The Amount Of The Award

Where a party has not carried its burden to establish that any of the Rule 37(c) exceptions apply, the rule provides that the court "shall" award "the reasonable expenses incurred in making that proof, including reasonable attorney's fees."[122] "The expenses that may be assessed are only those that could have been avoided by the admission, and do not include expenses incurred prior to the filing of the answers to the requests for admissions."[123] That means the court must determine the amount of a reasonable award for proving the matters that were the subject of the Uniformity Requests and the True Value Requests.

When evaluating the reasonableness of fees and expenses in this context, a court asks three questions:

> [1] were the expenses actually paid or incurred; [2] were the services that were rendered thought prudent and appropriate in the good faith professional judgment of competent counsel; and [3] were charges for

---

[120] Ct. Ch. R. 37(c)(4).

[121] *See Emerald P'rs,* 726 A.2d at 1224.

[122] Ct Ch. R. 37(c).

[123] Wright & Miller, *supra,* § 2290.

those services made at rates, or on a basis, charged to others for the same or comparable services under comparable circumstances.[124]

The Delaware Supreme Court has held that for purposes of Rule 37(c), "reasonableness" means "that not only are the number of hours, cost per hour, and other expenses charged reasonable in amount, but that the total amount assessed against a party bear a relationship to his responsibility in causing that party to prove the fact in question."[125]

The plaintiffs seek $631,362 in attorneys' fees and $20,940 in out-of-pocket costs, for a total award of $652,302. This decision awards $322,912 in attorneys' fees and $14,312 in out-of-pocket costs, for a total award of $337,224. Each of the Counties must bear one-third of the award.

### 1. Attorneys' Fees

The plaintiffs submitted a chart containing the following information identifying the fees incurred addressing the matters that the Counties failed to admit.

---

[124] *Delphi Easter P'rs Ltd. P'ship v. Spectacular P'rs, Inc.*, 1993 WL 328079, at *9 (Del. Ch. Aug. 6, 1993) (Allen, C.). *Delphi* is an advancement case, not a Rule 37(c) case, but its framework applies by analogy. *Id.*

[125] *Cline*, 418 A.2d at 985.

| Attorney | Organization | Rate | Hours | Value |
|---|---|---|---|---|
| Richard Morse | CLASI | $980.00 | 189 | $185,220.00 |
| Ryan Tack-Hooper | ACLU | $500.00 | 150 | $75,000.00 |
| Peta Gordon | A&P | $700.00 | 320.6 | $224,420.00 |
| Saul Morgenstern | A&P | $880.00 | 20.9 | $18,392.00 |
| Travis Clark | A&P | $300.00 | 213.4 | $64,020.00 |
| Jessica Laguerre | A&P | $350.00 | 118.4 | $41,440.00 |
| Krithika Santhanam | A&P | $300.00 | 21.8 | $6,540.00 |
| Abigail Langsam | A&P | $650.00 | 20.6 | $13,390.00 |
| Meredith B. Walsh | A&P | $300.00 | 9.8 | $2,940.00 |
| **Total** | | | **914.5** | **631,362.00** |

Under *Delphi*, the first question is whether the fees were actually incurred.[126] They plainly were.[127]

The second question is whether counsel devoted their time to tasks "thought prudent and appropriate in the good faith professional judgment of competent counsel."[128] The plaintiffs' counsel satisfied that standard. The litigation team for the plaintiffs comprised competent lawyers led by Richard Morse, a previous Legal Director of the ACLU. Morse has over forty-seven years of experience. He had the

---

[126] *Delphi*, 1993 WL 328079, at *9.

[127] The court reached the same conclusion in the *Quantification Ruling*. 2023 WL 2711328, at *2. The Counties did not challenge that ruling on appeal, making it law of the case.

[128] *Delphi*, 1993 WL 328079, at *9.

knowledge and competence to exercise good faith professional judgment regarding the tasks that were prudent and appropriate for this litigation.[129]

When counsel has exercised good faith professional judgment, a court will not second-guess the specific time entries that counsel have logged for particular tasks. Determining a reasonable fee award "does not require that this court examine individually each time entry and disbursement."[130] Analyzing specific time entries typically "would neither be useful nor practicable."[131]

The rationale for line-by-line review fades further when attorneys have an incentive not to overcharge. Often that incentive will flow from a client who is overseeing the billing process and may have to pick up the freight.[132] Although that was not the case here, the time that the plaintiffs' counsel expended had an opportunity cost. The attorneys from Arnold & Porter could not work for paying clients. The attorneys from the ACLU and CLASI could not work on other public interest matters. The plaintiffs' counsel therefore were incentivized to make

---

[129] The court reached the same conclusion in the *Quantification Ruling*. 2023 WL 2711328, at *2. The Counties did not challenge that ruling on appeal, making it law of the case.

[130] *Aveta Inc. v. Bengoa*, 2010 WL 3221823, at *6 (Del. Ch. Aug. 13, 2010); *accord Blank Rome, LLP v. Vendel*, 2003 WL 21801179, at *8–10 (Del. Ch. Aug. 5, 2003) (rejecting alleged requirement of line-item review).

[131] *Weichert Co. of Pa. v. Young*, 2008 WL 1914309, at *2 (Del. Ch. May 1, 2008).

[132] *See Aveta*, 2010 WL 3221823, at *6 (holding that Aveta had "sufficient incentive to monitor its counsel's work and ensure that counsel did not engage in excessive or unnecessary efforts" because Aveta could not be certain that it would be able to shift expenses at the time the expenses were incurred).

reasonable judgments about the tasks to pursue and the amount of time to spend on them. The court need not conduct a line-by-line review of the plaintiffs' time.[133]

One adjustment to the plaintiffs' submission, however, is warranted. Because Ryan Tack-Hooper did not support his hours with contemporaneous record keeping, the court only credits the plaintiffs with 50% of the 150 hours he claimed. The plaintiffs can recover for 75 hours of his work.[134]

The third question under *Delphi* is whether "charges for those services made at rates, or on a basis, charged to others for the same or comparable services under comparable circumstances."[135] To establish hourly rates for the plaintiffs' attorneys,[136] the plaintiffs submitted an affidavit from Elizabeth M. McGeever, an experienced Delaware practitioner and a director of the law firm of Prickett, Jones &

---

[133] The court reached the same conclusion in the *Quantification Ruling*. 2023 WL 2711328, at *2–3. The Counties did not challenge that ruling on appeal, making it law of the case.

[134] The court reached the same conclusion in the *Quantification Ruling*. *Id.* at *3. The Counties did not challenge that ruling on appeal, making it law of the case.

[135] *Delphi*, 1993 WL 328079, at *9.

[136] The ACLU and CLASI are not organizations that bill clients by the hour, so their attorneys do not have regular hourly rates. Arnold & Porter is an organization that bills clients by the hour and their attorneys have regular hourly rates, but Arnold & Porter insisted on redacting its hourly rates, claiming they were confidential and competitively sensitive information. *See* Defs.' Quantification Answering Br. at 17; Pls.' Quantification Reply Br., Ex. 15. Attorney fee petitions routinely provide rates, whether in this court, in bankruptcy court, or elsewhere. By redacting its rates, Arnold & Porter deprived the court of important information. Although the court suspects that the hourly rates that Arnold & Porter attorneys actually charge would provide further support for the reasonableness of the fee award, without that information, the court cannot consider it.

46

Elliott, P.A.[137] McGeever opined that rates ranging from $250 to $980 per hour, depending on the attorneys' level of experience, were reasonable for corporate litigation in this court and in bankruptcy proceedings in the District of Delaware.[138] The Counties relied on an affidavit from Kathleen M. Miller, now a Superior Court judge, who opined that hourly rates ranging from $250 to $550 per hour were reasonable for the type of work performed in this case.[139]

Determining what set of rates to use requires an exercise of judicial judgment.[140] The United States Court of Appeals for the Third Circuit has noted that when identifying rates for public interest law firms, a court should use "the community billing rate charged by attorneys of equivalent skill and experience performing work of similar complexity."[141] The court should not discount the community rates to reflect what underprivileged individuals might be able to pay.[142]

---

[137] *See* Pls.' Quantification Opening Br. at 19–20; Dkt. 442, Affidavit of Elizabeth M. McGeever (the "McGeever Affidavit") ¶ 1

[138] McGeever Aff. ¶ 12.

[139] Defs.' Quantification Answering. Br. at 26; Dkt 495, Affidavit of Nicholas J. Brannick Regarding Time Entries of Counsel for Plaintiffs Delawareans for Educational Opportunity and NAACP State Conference of Branches, Ex. A ("Miller Affidavit") ¶¶ 1, 26.

[140] *See In re Am. Real Est. P'rs*, 1997 WL 770718, at *7 (Del. Ch. Dec. 3, 1997) (exercising judicial discretion to set one reasonable hourly rate "attributable to a partner, associate or paralegal"); *see also Dickerson v. Castle*, 1992 WL 205796, at *2 (Del. Ch. Aug. 21, 1992), *aff'd*, 622 A.2d 1094 (Del. 1993) (exercising judicial discretion under a *quantum meruit* approach to award fees without calculating an hourly rate).

[141] *Student Pub. Int. Rsch. Gp. of New Jersey, Inc. v. AT&T Bell Lab'ys*, 842 F.2d 1436, 1450 (3d Cir. 1988).

[142] *Id.*

As the plaintiffs point out, public interest work is often just as complex and challenging as corporate and commercial litigation in this court. It is arguably more complex because the Supreme Court of the United States frequently changes the governing law, and the issues are not principally financial but rather present complex policy questions about the interplay between individual rights and governmental authority.

Those considerations suggest awarding the requested award and not imposing a significant reduction. But the Counties have argued persuasively that when litigating cases involving or against the county or state, attorneys do not charge the lofty rates of practitioners in fights among billion-dollar corporations and billionaire individuals. For those engagements, practitioners discount their rates.[143] A similar discount is appropriate here.

The Counties identified two decisions involving discounts. In one case, the attorneys discounted their customary rates by 12.5% to 23.9%.[144] In another, the court imposed a discount of 25% to 50%.[145] In this case, the court will start with the

[143] *See Dover Hist. Soc'y v. City of Dover Plan. Comm'n*, 2007 WL 1805777, at *3 (Del. Super. June 4, 2007) (noting that practitioners charged discounted rates), *aff'd*, 940 A.2d 946 (Del. 2007) (TABLE).

[144] Miller Aff. ¶¶ 23–25 & Ex. C.

[145] *See Weddle v. BP Amoco Chem. Co.*, 2020 WL 5049233, at *3–4 (Del. Super. Aug. 26, 2020) (reducing attorney hourly rate of $600 to $450, attorney hourly rate of $400 to $300, attorney hourly rate of $275 to $200, and paralegal hourly rate of $100 to $50).

McGeever rates, then discount them by 25%. That reduction lands at the midpoint of the two precedents.

Those rulings result in the following rates, hours, and amounts for the Rule 37(c) application:

| Attorney | Organization | Rate | Hours | Value |
|---|---|---|---|---|
| Richard Morse | CLASI | $735.00 | 189 | $138,915.00 |
| Ryan Tack-Hooper | ACLU | $375.00 | 75 | $ 28,125.00 |
| Peta Gordon | A&P | $525.00 | 320.6 | $168,315.00 |
| Saul Morgenstern | A&P | $660.00 | 20.9 | $13,794.00 |
| Travis Clark | A&P | $225.00 | 213.4 | $48,015.00 |
| Jessica Laguerre | A&P | $262.50 | 118.4 | $31,080.00 |
| Krithika Santhanam | A&P | $225.00 | 21.8 | $4,905.00 |
| Abigail Langsam | A&P | $487.50 | 20.6 | $10,042.50 |
| Meredith B. Walsh | A&P | $225.00 | 9.8 | $2,205.00 |
| **Total** | | | **989.5** | **$445,396.50** |

That, however, is not the end of the story. The plaintiffs' request for a fee award warrants a further reduction because it is overbroad. The plaintiffs stated that the amounts they requested represent "the amount of time spent by each attorney to prove *liability* following defendants' refusal to admit."[146] Rule 37(c) only entitles the plaintiffs to the expenses incurred to prove the matters that were the subject of the requests.

The plaintiffs are entitled to an award of the expenses required to prove the matters that were the subject of the Uniformity Requests and the True Value Requests. This decision first addresses fees, then out-of-pocket costs.

---

[146] Pls.' Opening Br. at 28 n.13 (emphasis added).

49

Aa starting point, the court attributes half of the $445,396.50 in fees to each set of requests. No one has argued for a different allocation. That results in an allocation of $222,698 for each set of requests.

For the Uniformity Requests, the court will apply an additional discount of 5%. If the Counties had responded to the Uniformity Requests with admissions, then those admissions would have largely established the Counties' liability for violating the Uniformity Clause. A 5% discount reflects what little else the plaintiffs would have needed to do if the Counties had provided the appropriate admissions. THe 95% award reflects how much effort the plaintiffs had to expend to prove the matters covered by the Uniformity Requests. That discount results in an award of $211,563 for the Uniformity Requests.

For the True Value Requests, the court will apply a discount of 50%. The True Value Requests only addressed the Counties' knowledge of facts contradicting the 2019 Equalization Report. Even if the Counties had admitted that they had no knowledge of any contradictory information, the plaintiffs still would have had to undertake a significant effort to prove a violation of the True Value Statute. The 50% discount recognizes that the admissions would have gotten them approximately half-way there, but no more. That discount results in an award of $111,349 for the True Value Requests.

In total, the plaintiffs are entitled to an award of $322,912 in attorneys' fees.

## 2.    Out-Of-Pocket Costs

Next comes out-of-pocket costs. For the Rule 37(c) award, the plaintiffs seek $20,940 in out-of-pocket costs.[147] Of that amount, the court already awarded $1,200, reducing the request to $19,740.

To allocate the costs between the Uniformity Requests and the True Value Requests, the court uses the same procedure it used for the attorneys' fees component. That results in an award of $9,377 for the Uniformity Requests and $4,935 for the True Value Requests.

In total, the plaintiffs are entitled to $14,312 in out-of-pocket costs.

## 3.    The Allocation Across The Counties

The total award under Rule 37(c) amounts to $337,224. The last issue requires allocating the award across the Counties.

The Delaware Supreme Court requires that "the total amount assessed against a party bear a relationship to his responsibility in causing that party to prove the fact in question."[148] The plaintiffs seek to have the award allocated evenly between the counties.[149] That allocation makes sense. The plaintiffs served Uniformity Requests and True Value Requests on all three Counties, and all three denied the requests. Proving the matters covered by those requests required the plaintiffs to develop and

---

[147] Pls.' Opening Br. at 27.

[148] *Cline*, 418 A.2d at 985.

[149] Pls.' Opening Br. at 28.

present similar evidence. The Counties therefore are each equally responsible for causing the plaintiffs to need to prove the Uniformity Requests and the True Value Requests.

This decision therefore allocates an equal one-third share of the total Rule 37(c) expense award to each county. Each county's share is $112,408.

### III.   CONCLUSION

Rule 37(c) entitles the plaintiffs to recover $322,912 in attorneys' fees and $14,312 in out-of-pocket costs for a total award of $337,224. Each of the Counties is responsible for $112,408. The parties will submit an agreed-upon form of final order within thirty days. If the parties cannot agree on a form of order, they will submit a joint letter identifying the points of disagreement and each side's position.